UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FAUSTINA E. HAYNES,

                          Plaintiff,

          - against -

THE CITY OF NEW YORK, DAVID
HANSELL, JILL KRAUSS, MELISSA
HESTER, TIA WADDY, and JOHN and JANE
DOE (said names being fictitious, the persons
intended being those who aided
and abetted the unlawful conduct of the named
Defendants),

                          Defendants.

---

**MEMORANDUM
OPINION & ORDER**

19 Civ. 11008 (PGG) (JW)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Faustina Haynes brings claims of disability and age discrimination

against Defendants City of New York, David Hansell, Jill Krauss, Melissa Hester, and Tia

Waddy (collectively "Defendants") pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C.

§ 701, et seq., the New York State Human Rights Law, N.Y. Executive Law § 296, et seq.

("NYSHRL"), the New York City Human Rights Law, N.Y.C. Administrative Code § 8-107, et

seq. ("NYCHRL"), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq.

("FMLA").

On February 5, 2021, Defendants moved for summary judgment on all of

Plaintiff's claims.  (Dkt. No. 74)  On September 19, 2023, this Court referred Defendants'

motion to Magistrate Judge Jennifer Willis for a Report and Recommendation ("R&R").  (Dkt.

No. 90)  On March 26, 2024, Judge Willis issued a 46-page R&R recommending that

Defendants' motion be granted in part and denied in part.  (Dkt. No. 95)  Defendants filed

objections to certain of Judge Willis's recommendations on May 9, 2024.  (Dkt. No. 99)

Plaintiff has not objected to the R&R.

      For the reasons stated below, Defendants' objections will be overruled, the R&R

will be adopted in its entirety, and Defendants' motion for summary judgment will be granted in

part and denied in part.

## BACKGROUND

I.    **FACTS**[1]

    A.    **The Parties**

      Plaintiff was born in 1970 and is currently employed by the New York City

Administration for Children's Services ("ACS").  (R&R (Dkt. No. 75) at 10; Def. R. 56.1 Stmt.

(Dkt. No. 76) ¶ 3)

      Defendant David Hansell is the former Commissioner of ACS.  (Def. R. 56.1

Stmt. (Dkt. No. 76) ¶ 25)  Defendant Jill Krauss was Hansell's chief of staff, and Defendant Tia

---

[1]  The parties have not objected to Judge Willis's recitation of the facts.  Accordingly, this Court adopts her account of the alleged facts in full.  See Silverman v. 3D Total Solutions, Inc., No. 18 CIV. 10231 (AT), 2020 WL 1285049 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the R&R's characterization of the background facts . . . , the Court adopts the R&R's 'Background' section and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16-CV-4425 (VEC)(SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not object to the Magistrate Judge's . . . recitation of the facts of this case, and the Court adopts them in full.").

To the extent that this Court has cited to a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where the opposing party disagrees with the movant's characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the opposing party's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

Waddy was Hansell's deputy chief of staff.  (Id. ¶ 27)  Defendant Melissa Hester was the

Associate Commissioner of Human Resources at ACS.  (Id. ¶ 61)

**B.      Plaintiff's Education and Employment History**

Plaintiff has a bachelor of arts degree in sociology from Columbia University, and

a master's degree and doctorate in sociology from Harvard University.  (R&R (Dkt. No. 95) at 3-

4)  Between 1998 and 2000, Plaintiff was a "Carnegie-Mellon Foundation Post-doctoral lecturer

and researcher at Bryn Mawr College, where she taught sociology."  (Id.)

In 2001, Plaintiff "was hired as the Deputy Director of Human Resources at [New

York City's] Department of Health and Mental Hygiene."  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 4)

In 2006, Plaintiff "transferred to the City's Office of Management and Budget as a Supervising

Analyst."  (Id. ¶ 6)

In 2008, Plaintiff began working at ACS as a Human Resources Manager.  (Id.

¶ 7)  In that role, Plaintiff oversaw the "recruitment unit"; the "performance management unit,"

which is responsible for "performance evaluations"; the "Classifications Unit," which is "an area

within Human Resources that classifies titles according to the job specifications"; a "Work

Experience Program," which "allowed people who were going from welfare to work . . . to have

placement at ACS"; and "other smaller auxiliary units."  (Maduegbuna Decl., Ex. 1 (Pltf. Dep.)

(Dkt. No. 83-1) at 27, 29-30)

In 2012, Plaintiff became Executive Director and Chief of Staff at ACS's Human

Resources Department, where she reported to Assistant Commissioner of Human Resources

Claudette Wynter.  (Id. at 29; Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 8)  In that role, Plaintiff was

"responsible for the [same] portfolio that [she] had . . . when [she] was the Human Resources

Manager," with the addition of the "Certifications" unit, which oversees ACS's civil service

hiring.  (Pltf. Dep. (Dkt. No. 83-1) at 31)

In 2015, Wynter left her position as Assistant Commissioner of Human

Resources, and ACS Deputy Commissioner Mitch Gipson asked Plaintiff to serve as the Acting

Assistant Commissioner. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 12)  Plaintiff served as the Acting

Assistant Commissioner for nine months, while simultaneously interviewing for the permanent

position. (Id. ¶¶ 15-16, 18)  Karen Alexander was eventually selected for the position, and

Plaintiff reverted to her prior role as Executive Director and Chief of Staff. (Id. ¶¶ 18-20)

### C.    Plaintiff's Alleged Disabilities

In 2017, Plaintiff suffered an injury while working at ACS. "[S]he went to sit

down on a chair [and] it rolled away from her on the tile floor and she fell." Plaintiff developed

"a herniated disc and a bulging disk in her back." (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 22-23)  As

a result of her injury, Plaintiff experiences "constant pain" and takes "different pain

medications . . . as needed." "It's quite difficult for [her] to either get up and make it into work

or do daily activity like cooking, going out, shopping, taking a shower." (Pltf. Dep. (Dkt. No.

83-1) at 20)  Plaintiff has "received physical therapy" for her condition, and she is currently

"doing pain management." (Id. at 20-21)

In May 2018, Plaintiff "was diagnosed with uterine fibroids" by Dr. Edward Jew,

her OB/GYN. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 22; Pltf. Dep. (Dkt. No. 83-1) at 21, 138)[2]  By

August 2018, Plaintiff's uterine fibroids "had grown all the way to a size of a four-month old

_____

[2] Dr. Taraneh Shirazian also treated Plaintiff for her uterine fibroid condition.  In FMLA
paperwork that Dr. Shirazian completed for Plaintiff in March 2019, she states that Plaintiff's
condition "commenced" on November 8, 2018.  (Mar. 4, 2019 Certification of Physician Under
FMLA, Marcus Decl., Ex. BB (Dkt. No. 77-28) at 2, 4)  Plaintiff states that she consulted Dr.
Shirazian in late 2018 after "Dr. Jew recommended that [she] see a surgeon who specializes in
'minimally invasive surgery' if [she] felt discomfort due to the fibroids' growth." (Pltf. Decl.,
Maduegbuna Decl., Ex. 4 (Dkt. No. 83-4) ¶ 25)  According to Plaintiff, the November 8, 2018
date on the FMLA paperwork reflects her later consultation with Dr. Shirazian, and not the date
that her condition was originally diagnosed by Dr. Jew.  (Id.)

fetus," the condition "was affecting [her] bladder," and she "was having to urinate every 15 to 20 minutes." (Pltf. Dep. (Dkt. No. 83-1) at 21-22)  In March 2019, Plaintiff had her uterine fibroids removed. (Id.; Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 240)

**D.     Plaintiff Serves as Acting Assistant Commissioner for the Second Time**

In July 2018, Karen Alexander resigned as the Assistant Commissioner of Human Resources at ACS. (R&R (Dkt. No. 95) at 3)  Defendant Jill Krauss "recommended that [P]laintiff serve as the Acting Assistant Commissioner of Human Resources," and Defendant David Hansell "approved Krauss' recommendation." (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 30)  Plaintiff then "agreed to serve [again] as the Acting Assistant Commissioner of Human Resources," reporting to Defendant Krauss. (Id. ¶ 32)  Plaintiff served in that role from July 2018 to November 2018. (Id. ¶ 38)

On July 19, 2018, while serving in the acting role, Plaintiff again applied for the permanent position, which had been re-designated "Associate Commissioner of Human Resources." (Id. ¶ 40; Marcus Decl., Ex. N (July 19, 2018 Haynes Letter) (Dkt. No. 77-14) at 2)  Between August and September 2018, Plaintiff participated in three rounds of interviews for this position. (Id. ¶ 41)

**E.     The Jacques Edwards Incident**

On August 7, 2018 – during the time period in which Plaintiff was serving as the Acting Assistant Commissioner and was interviewing for the new Associate Commissioner role – a troubling incident took place at an ACS facility. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 79)  Jacques Edwards – who "had a previous felony conviction" – "was working in the New York City Children's Center . . . and directly supervising young children when [he] allegedly harmed a young child." (Id.)

As a result of this incident, the New York State Office of Children Family Services ("OCFS") opened an investigation as to "whether Edwards had gone through appropriate criminal background checks."  The New York City Department of Investigation ("DOI") also "began an investigation into the incident" and "ACS's hiring practices as [they] relate[] to criminal background checks."  (Id. ¶¶ 81-82)  Defendant Hansell described the incident as "a very, very serious situation for the agency."  (Maduegbuna Decl., Ex. 13 (Hansell Dep.) (Dkt. No. 83-13) at 69)

Plaintiff "helped draft ACS's responses to the OCFS investigation" (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 93), and she assisted in "reviewing the files" of ACS employees "who had prior felony convictions to determine if it was appropriate for them to be performing their duties," and in order to "conduct[] background clearances for a large number of ACS staff."  (Id. ¶ 95; Maduegbuna Decl., Ex. 4 (Pltf. Decl.) (Dkt. No. 83-4) ¶¶ 18-19)

**F.    Plaintiff's August 2018 Leave Request**

In August 2018 – as ACS was addressing the Jacques Edwards incident – Plaintiff asked Defendant Tia Waddy to approve her request for three weeks of leave.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 100; Pltf. Dep. (Dkt. No. 83-1) at 60)  At her deposition, Plaintiff testified that she told Waddy that she "had some medical issues"; that she "had the back issue[,] the herniated disc and the bulging disc"; and that she "had some fibroids that [she] needed to attend to."  (Pltf. Dep. (Dkt. No. 83-1) at 60)  At Waddy's deposition, however, she testified that Plaintiff had requested "three weeks of vacation," because "school was starting and she wanted to spend time with her son, prior to him returning to school."  (Marcus Decl., Ex. E (Waddy Dep.) (Dkt. No. 77-5) at 46)

The parties agree that – during this meeting – Waddy "suggested that plaintiff submit her request in writing to Krauss."  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 101)  In an August

17, 2018 email to Defendants Waddy and Krauss with the subject line "Vacation request,"

Plaintiff wrote: "Tuesday August 27 to Monday September 10.  I will give you the list of all key

HR staff and Back-up Staff on Monday."  (Marcus Decl., Ex. X (Aug. 17 to 21, 2018 email

chain) (Dkt. No. 77-24) at 3)  On August 20, 2018, Plaintiff replied to her own email and

expanded her requested vacation time to "Wednesday 8/22 to 9/11."  (Id.)

On August 21, 2018, Defendant Krauss responded to Plaintiff's email as follows:

> I just called to discuss the below.  While I understand this has been a challenging
> few weeks, as you know better than just about anyone, we are in the midst of an
> HR crisis and a three week vacation is not possible at this time.
>
> I would be happy to talk with you this morning about how you might take a few
> days off next week and then we can discuss a more extended time away in the
> near future.  However, it is important that you be on site at ACS this week.  Please
> call or come by to discuss further.

(Id. at 2-3)

Later that day, Plaintiff replied:

> I am extremely exhausted and also in a great deal of pain due to 2 herniated discs
> and 1 bulging disk from my fall on the job.  I have not been able to take the
> necessary medical days to address these issues.
>
> I have been working 10+ hours for over 3 years and I am exhausted.
>
> I have also mentioned on several occasions that I have not been able to spend any
> time with my son during the school year and now that he is out of school I would
> like to spend more than just a few days with him.  We can certainly discuss
> further.  I am here to serve.

(Id. at 2)

Later that day, Plaintiff met with Krauss to discuss her leave request.  (Pltf. Dep.

(Dkt. No. 83-1) at 62)  Plaintiff testified that she "felt extremely intimidated by Ms. Krauss" at

this meeting; Krauss was "essentially bullying [her] to decide which leave to take first"; Krauss

"looked visibly upset or angry"; and Krauss "turned red" and was "clinching her jaws."  (Id. at

63)  Plaintiff also testified that Krauss told her that she "was going to bring [Plaintiff's request for leave] to the Commissioner's attention."  (Id. at 67)

Krauss testified that, during this meeting, Plaintiff "became very upset and left [her] office."  (Marcus Decl., Ex. D (Krauss Dep.) (Dkt. No. 77-4) at 87)

Later that afternoon, Defendant Krauss drafted the following email to ACS Commissioner Hansell:

> This conversation with Faustina did not go well.
>
> I asked her to scale back this request and let me know how much time she needed, given the crisis we are facing, to let me know what is absolutely necessary to handle her health issues.  I reiterated how important her institutional knowledge is to us, especially at this time.
>
> I then asked for a revised proposal of a handful of days that would allow her rest/treatment for the next several weeks and we can look at an extended leave period later in the fall.  She was very taken aback and said that is unacceptable. She puts in very long hours, everything is an emergency and she needs a break. She requested I tell her what I would allow.  I again asked her to let me know what is possible.  She said she is not going to do that.  I asked her what she meant, whether I should let the Commissioner know that she is planning to take off three weeks tomorrow.  She said she needed to excuse herself and left.

(Marcus Decl. Ex. X (Aug. 17 to 21, 2018 email chain) (Dkt. No. 77-24) at 2)  Krauss never sent the email.  (Marcus Decl. Ex. D (Krauss Dep.) (Dkt. No. 77-4) at 89)

Although Krauss did not send Hansell the email she had drafted, that same day she informed both Hansell and Waddy that Plaintiff had requested leave.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 110)  And in an August 22, 2018 email, Krauss told Plaintiff that "[t]he Commissioner [had] asked for an update" concerning Plaintiff's requested leave.  (Maduegbuna Decl., Ex. 23 (Aug. 22, 2018 email chain) (Dkt. No. 83-23) at 2)

Plaintiff testified that at some point after her meeting with Krauss, Plaintiff met with Hansell and Krauss regarding her leave request.  At that meeting, "Commissioner Hansell essentially said, 'I need you here. The agency is in crisis.'"  (Pltf. Dep. (Dkt. No. 83-1) at 67-68)

Hansell denies that he ever met with Plaintiff to discuss her leave request. (Maduegbuna Decl.,

Ex. 13 (Hansell Dep. Tr.) (Dkt. No. 83-13) at 122)

　　　　In any event, Plaintiff "did not submit any paperwork in August 2018 to request

leave under the FMLA." (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 127)

### G.　　Plaintiff Interviews for the Associate Commissioner<br>　　　　Position and Takes Leave in September 2018

　　　　As discussed above, in August and September 2018, Plaintiff was interviewing

for the position of ACS Associate Commissioner of Human Resources. (Def. R. 56.1 Stmt. (Dkt.

No. 76) ¶ 41)

　　　　Plaintiff's first-round interview took place on August 20, 2018 – the day before

Plaintiff's meeting with Krauss regarding her leave request. (Maduegbuna Decl., Ex. 27 (Aug.

16, 2020 meeting invitation) (Dkt. No. 83-27) at 2) The interviewers included Defendant

Waddy, Tovah Gottesman – the chief of staff for ACS's Division of Finance – and two other

ACS employees. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 42)

　　　　On August 21, 2018 – a day after Plaintiff's first-round interview, and the day of

her meeting with Krauss – Waddy and Gottesman exchanged the following text messages:

> WADDY:  I think [Plaintiff] thinks this has nothing to do w her. She really
> doesn't get it.
>
> GOTTESMAN:  Or she took vacation early so she can't get fired??
>
> WADDY:  I was livid when I saw [that Plaintiff Haynes was] out of office
>
> WADDY:  It wasn't approved and she said she wanted to start vacay tmrw
>
> WADDY:  AND in the midst of all of this she is interviewing?!?! Wtf

(Marcus Decl., Ex. 26 (Aug. 21, 2018 text messages) (Dkt. No. 77-26) at 2)

　　　　Waddy testified that she wrote the first text message in "response to the audit that

was being conducted by OCFS" concerning the Jacques Edward incident. (Marcus Decl., Ex. E

(Waddy Dep.) (Dkt. No. 77-5) at 56)  Gottesman testified that her response – "she took vacation early so she can't get fired" – was meant to suggest that Plaintiff was attempting to be "out of sight, out of mind."  (Marcus Decl., Ex. I (Nov. 12, 2020 Gottesman Dep.) (Dkt. No. 77-9) at 84)

Plaintiff was selected to move on to the second round of interviews for the Associate Commissioner position.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 47)  On September 7, 2018, the panelists who had conducted the second-round interviews recommended that two candidates other than Plaintiff "advance to the next level."  (Marcus Decl., Ex. P (Sept. 7, 2018 Ferrero email) (Dkt. No. 77-16) at 2)  As to Plaintiff, the panelists recommended that she "be encouraged to apply" for two new Human Resources Assistant Commissioner positions that would be subordinate to the Associate Commissioner position.  (Id.)

Despite the panel's recommendation, Krauss urged "that [P]laintiff be interviewed in the final round[,] because she felt that it was important for [P]laintiff to have a chance to speak to Commissioner Hansell and explain why [P]laintiff believed she was a good candidate for the position, even though Krauss did not believe so."  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 53)

In a September 11, 2018 email to Krauss and Waddy, Plaintiff stated:  "I am having severe back pains this morning.  I am heading to the doctor's office."  (Marcus Decl., Ex. CC (Sept. 11-12, 2018 email chain) (Dkt. No. 77-29) at 2) And in a September 12, 2018 email to Krauss and Waddy Plaintiff reported:  "I had a minor procedure done yesterday and on [sic] serious painkillers which makes me so drowsy.  Doctor has me out until Monday, 9/17."  (Id.) Plaintiff "was out on sick leave from September 11, 2018 through September 14, 2018."  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 139)

On September 28, 2018, Waddy sent Krauss the following email regarding Plaintiff's leave:

> Flagging for you that Faustina submitted a doctor's note for her time out of the office (9/11-9/14) and listed "Worker's Comp Case" in the comments section in CityTime (adding a comment is optional). The doctor's note appears to be legitimate so it will be approved. Just wanted to flag that a special notation was made and may indicate future behavior.

(Maduegbuna Decl., Ex. 21 (Sept. 28, 2018 email) (Dkt. No. 83-21) at 2)

The final round interviews for the Associate Commissioner position took place on September 24, 2018. (Maduegbuna Decl., Ex. 11 (Sept. 12, 2018 meeting invitation) (Dkt. No. 83-11) at 2) Defendants Hansell and Krauss, and Eric Brettschneider – the First Deputy Commissioner of ACS – interviewed three candidates. (Id.; see also Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 54-57) Krauss testified that – after the interviews – the three "weighed the pros and cons" of two candidates, and "may have spent a very short amount of time talking about [Plaintiff]," because she believed that "all three of us were of the opinion that [Plaintiff] wasn't the best fit for the position." (Marcus Decl., Ex. D (Krauss Dep.) (Dkt. No. 77-4) at 146-47)

Krauss testified that "one of the reasons that [she] felt that [Plaintiff] was not an appropriate fit for the position" related to "instances in which [Plaintiff] gave confusing information to cabinet members."[3] (Id. at 197) In this regard, Krauss testified about

> an instance when [Plaintiff] was sitting in on a cabinet meeting in [the] absence [of the former Assistant Commissioner of Human Resources] and there was questions about the City's compliance with a lawsuit related to Civil Service titles. And she answered questions from cabinet members with great certainty, that later turned out to be not entirely accurate and it caused a lot of confusion among cabinet members, that they couldn't rely on HR for clear directives.

---

[3] The ACS Commissioner's "cabinet" included the Deputy Commissioner, the Associate Commissioner, the Chief Operating Officer, the Chief Information Officer, the First Deputy Commissioner, and the Executive Deputy Commissioner. The Assistant Commissioner was "invited to and attended all Cabinet Meetings by Defendant Hansell." (Maduegbuna Decl., Ex. 4 (Pltf. Decl.) (Dkt. No. 83-4) ¶ 8)

(Id.)  Plaintiff denies that she provided inaccurate information to cabinet members during this meeting.  (Maduegbuna Decl., Ex. 4 (Pltf. Decl.) (Dkt. No. 83-4) ¶¶ 12-14)

Defendant Melissa Hester was selected for the Associate Commissioner of Human Resources position in October 2018.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 61, 72)

## H.    Plaintiff Applies for Assistant Commissioner of Recruitment and Retention Position

On July 18, 2018, "a job vacancy notice was posted for the Assistant Commissioner of Recruitment and Retention position."  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 270) In the "summer of 2018" – while serving as the Acting Assistant Commissioner of Human Resources and interviewing for the new Associate Commissioner role – Plaintiff applied for the Recruitment and Retention position.  (Id. ¶ 272)

In the fall of 2018, after Plaintiff learned that Hester would be the new Associate Commissioner, Defendant Hansell told Plaintiff that she "did a good job" and that "the next round [of interviews] for the Assistant Commissioner position would start soon."  (Pltf. Dep. (Dkt. No. 83-1) at 79) at 45)  As noted above, the panelists for Plaintiff's second-round interview for the Associate Commissioner position had recommended that Plaintiff "be encouraged to apply" for one of the two new Assistant Commissioner roles, including the Assistant Commissioner of Recruitment and Retention position.  (Marcus Decl., Ex. P (Sept. 7, 2018 Ferrero email) (Dkt. No. 77-16) at 2)

Hester and Waddy interviewed at least one candidate for the Assistant Commissioner of Recruitment and Retention position in February 2019, but no one was hired at that time.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 273-74)  Plaintiff was not interviewed for the position.  (Id.)

During the winter of 2020, Hester interviewed four additional candidates for the Recruitment and Retention position. (Id. ¶¶ 275, 277) Once again, Plaintiff was not selected for an interview. (Id.) In early April 2020, Defendant Hansell selected Brandon Respress for the position. (Id. ¶¶ 280-81)

I.    **Hester Begins Work at ACS**

Hester began work at ACS on November 19, 2018 as the Associate Commissioner of Human Resources. (Id. ¶ 77) She attended weekly meetings with Defendants Krauss and Waddy to discuss her "priorities" in Human Resources. (Maduegbuna Decl., Ex. 15 (Hester Dep.) (Dkt. No. 83-15) at 120-21) Plaintiff did not attend those meetings, and Hester testified that she "[doesn't] know why [Plaintiff] wasn't included." (Id. at 121)

Plaintiff took additional sick leave between December 5, 2018 and December 7, 2018. (Maduegbuna Decl., Ex. 30 (Haynes Leave Requests Report) (Dkt. No. 77-30) at 2) On December 5, 2018, Plaintiff "sent an email [to Waddy, Krauss, Hester and others] indicating that she was out of the office and that any questions should be sent to Waddy." (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 195; (Marcus Decl., Ex. NN (Dec. 5, 2018 email chain) (Dkt. No. 77-40) at 3)) Krauss replied to Plaintiff's email two minutes later, saying that "[a]n email like this should not go out without a conversation in advance with Tia [Waddy]." (Marcus Decl., Ex. NN (Dec. 5, 2018 email chain) (Dkt. No. 77-40) at 2) Hester told Krauss that she "did not know she was going to be out today and we were both in till about 8pm yesterday." (Id. at 1) Krauss replied:

> Both the fact that she failed to notify you that she was going to be out and the fact that she assigned Tia [Waddy] the task of handling the division for the day are unacceptable on her part. While of course Tia [Waddy] and I are both available to support the team, she doesn't even know if Tia [Waddy] is here today. And regardless, she cannot be making assignments to Tia [Waddy]. Very frustrating.

(Id.) Hester replied: "I will speak with her." (Id.)

Plaintiff sent an identical email to Waddy, Krauss, Hester, and others, the next day. Krauss responded as follows:

> I'm sorry to hear that you're not well but I am disappointed to be sending this email for the second day in a row. You should not be making assignments to Tia [Waddy], not only because she doesn't report to you, but also because you have not checked with her, with me, or with Melissa [Hester]. You do not know if Tia [Waddy] is in the office today and you have no idea what else she is doing. If you cannot be at work, you should notify Melissa [Hester] (who has been responding to emails while she has been away), and she will come up with a plan for coverage. It is imperative that you have these conversations prior to sending emails like the one below.

(Marcus Decl., Ex. OO (Dec. 6-10, 2018 email chain) (Dkt. No. 77-41) at 2)

On December 10, 2018, Plaintiff responded as follows:

> Melissa [Hester] spoke with me a few minutes ago and I apologize for any inconvenience. Moving forward I will route all communication to Melissa as instructed. Also, I missed your email on Wednesday 12/5 and would never have sent another email out had I seen it.

(Id.)

On December 10, 2018, Hester offered Evan Jones a newly created position as Special Advisor to Hester. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 169) Jones was born in 1982, and was thus twelve years younger than Plaintiff. (Id. ¶ 168)

Hester testified that Jones' responsibilities in the new Special Advisor position "could be interpreted" as "similar" to the responsibilities of the Human Resources Chief of Staff – the position then occupied by Plaintiff. (Maduegbuna Decl., Ex. 15 (Hester Dep.) (Dkt. No. 83-15) at 92) Hester "considered" giving Plaintiff assignments consistent with her Chief of Staff role, but decided not to, because

> a lot of things were happening with [Plaintiff] that – that I thought were going against the grain of how I was trying to move HR forward. So some of those items were e-mails, if I was – if someone sent an e-mail, I would respond one way, [Plaintiff] would then respond a couple days later, another way. If we were [at] meetings, [Plaintiff] would – if I would respond one way, [Plaintiff] would

then speak over me or say something to the effect like, oh, we tried to do that or we can't do that because of X, Y and Z. So it was like a lot of like tension there.

(Id. 93-94)  Evan Jones began work at ACS as Hester's Special Advisor on January 2, 2019.

(Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 171)

J.    **Plaintiff's Change in Responsibilities**

Plaintiff took vacation leave between December 18, 2018 and January 2, 2019

(Id. ¶ 201)  On January 6, 2019, Hester sent the following email to Plaintiff:

Just a couple of things that I have been meaning to follow-up with you on.

1. Please inform me of any and all meetings you are currently attending and what those meetings are about.

2. I would like a list of projects you are currently working on.

3. Your current title is Executive Director.  Please drop Chief of Staff as you are not operating in that vain [sic].

4. Please do not direct any HR staff on any tasks unless I am first informed and give the go ahead.  This includes Ronald Deane and Philip Flint.

The lines are blurred in some areas and staff are confused as [to] where the reporting lines are at this point and I want everything to be as clear as possible as I am making changes.

(Marcus Decl., Ex. QQ (Jan. 6 to 24, 2019 email chain) (Dkt. No. 77-43) at 3)

On January 8, 2019, Plaintiff and Hester met to discuss Plaintiff's new role at ACS Human Resources.  Plaintiff testified that, at this meeting, "Hester told [her] she was reassigning [her] to . . . Executive Director of [S]pecial Projects."  Hester also told Plaintiff that she believed that Plaintiff "had PTSD" and "needed time to rejuvenate in a different role."  (Pltf. Dep. (Dkt. No. 83-1) at 79)  According to Plaintiff, Hester did not say that Plaintiff's job performance had been poor or that she had engaged in "inappropriate behavior."  (Id. at 80)  While Plaintiff had previously supervised "over a dozen employees" in her role as Executive

Director and Chief of Staff, after her reassignment to Executive Director of Special Projects, she

had "a staff of two" within the "[work] classifications" function.  (Id. at 81)

On January 9, 2019, Plaintiff sent the following email to Hester:

> I wanted to follow-up on our meeting yesterday regarding our discussion of my
> new roles and responsibilities.  Thank you for taking the time to talk with me.  As
> you proposed, I will remain as the Executive Director and work on Special
> Projects.  The goal is this new role will give me an opportunity to re-energize
> after leading this office under two separate occasions and under extreme
> circumstances.
>
> I had an opportunity to "sleep on it."  I would like to discuss an alternate option to
> coordinate my move out of HR and into another Division.  I hope that you and the
> Commissioner will support and help facilitate this option.  I believe moving out of
> HR would help re-energize me and also give me an opportunity to grow
> professionally, make contributions, and reinvent myself in another division of the
> agency.

(Marcus Decl., Ex. QQ (Jan. 6 to 24, 2019 email chain) (Dkt. No. 77-43) at 2)

At deposition, Plaintiff testified that she "loved working in Human Resources"

and had "never wanted to move out of Human Resources," but that Hester had "created an

extremely hostile work environment."  "When [Plaintiff] came back from the vacation in

December, [she] had no assignments, except for the work that [she] was already doing before

[she] left." (Pltf. Dep. (Dkt. No. 83-1) at 96)

After Plaintiff's title was changed, she continued to report to Hester and her salary

did not change.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 208-09)  But it is undisputed that – after the

title change – Hester began to exclude Plaintiff from work meetings.  (Id. ¶ 212)

In a January 23, 2019 email to Krauss and Waddy, Plaintiff requested a

reassignment out of Human Resources:

> I have spoken with Melissa [Hester] and she mentioned/suggested that I raise this
> issue with you.  It is with a deep sense of concern that I write this urgent letter to
> you, seeking your personal intervention and assistance in facilitating my
> reassignment with dignity and honor (as I have coordinated for others here at
> ACS) out of the Office of Human Resources. . . .

- My current status in HR and in the newly assigned position as Executive Director of Special [P]rojects with a total of (2) two staff reporting to me is totally untenable and humiliating. For example, last Friday, Melissa [Hester] called a meeting (that I also attended) with the Recruitment, Compliance, and Investigations Units. These units were recently removed from my managerial oversight and are core units within HR. . . .

- At this meeting, it was obvious that my attendance was not helpful to the success of the meeting. After the meeting, accordingly, I spoke with Melissa [Hester] and requested to be recused from future meetings.

- This recusal however, as necessary as it is, also means that my role in HR will be ineffective going forward.

- The staff who previously reported to me were told to exclude me from all future emails.

- My current and future role in HR is untenable, unworkable, and humiliating. I humbly request to be reassigned out of HR immediately so that I can preserve my professional reputation in the agency.

**Urgent Request.** I advised Melissa [Hester] a few weeks back that, I am willing to step aside, with honor and dignity, to allow her to field her own team. I do not want to remain in HR while the remaining high level positions are being filled, as it is clear that I am being "forced out." . . . The new HR leadership needs its own team and to facilitate the agency's mission, I am willing to graciously step aside immediately. Having served loyally and under the most critical and challenging circumstances, I certainly do not deserve a reassignment that is in reality a demotion in title and scope of autonomy in the office. . . .

(Marcus Decl., Ex. 46 (Jan. 23, 2019 email) (Dkt. No. 77-46) at 3-4) (bold in original)

K.    **Plaintiff's Equal Employment Opportunity Complaint**

On January 23, 2019, Plaintiff filed a discrimination complaint with the ACS Office of Equal Employment Opportunity ("ACS EEO"). (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 223) Later that day, Jodi Savage – the ACS EEO Director – advised Plaintiff that because her complaint involved Defendant Commissioner Hansell, she would refer it to the City's Department of Citywide Administrative Services ("DCAS"). (Id. ¶ 224) In a March 4, 2019 email to Plaintiff, DCAS acknowledged her complaint and stated that they were reviewing the matter. (Id. ¶ 237)

17

Hansell did not learn of Plaintiff's ACS EEO complaint until July 2019 (id. ¶ 267); Krauss first learned of Plaintiff's complaint in the "summer of 2019" (id. ¶ 266); and Hester learned about Plaintiff's EEO complaint when the instant case was filed in November 2019. (Id. ¶ 227)

At deposition, ACS EEO Director Savage testified that Defendant Hansell has "[n]ot always" "honored the agency's commitment in the EEO plans that are put out by ACS." (Maduegbuna Decl., Ex. 3 (Savage Dep.) (Dkt. No. 83-3) at 69) According to Savage, "disability rights is something that the agency definitely doesn't value"; reasonable accommodations are "generally frowned upon" at ACS; and the ACS EEO office "constantly face[s] a lot of pushback on reasonable accommodations." (Id. at 35, 70)

> [T]here is just a general attitude, you know, that people who request [a reasonable accommodation] are malingerers and we need to figure out how to, you know, get less people to request them or, you know, figure out how to deny them or, you know, figure out how to lower the numbers.

(Id. at 70) Savage further testified that she has experienced "pushback" at ACS in connection with disability complaints; she has not seen a similar reaction to complaints premised on race, age, or gender. (Id. at 72-73)

L. **Plaintiff's FMLA Leave and Departure from the ACS Human Resources Department**

In March 2019, Plaintiff's "uterine fibroids were removed," and she took FMLA leave between March 22, 2019 and April 12, 2019. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 239-40)

Two weeks after Plaintiff returned from FMLA leave, "Hester told [Plaintiff] that [she] needed to leave the office in two weeks." (Id. ¶ 241) On April 26, 2019, Plaintiff sent the following email to Hester:

> Thank you for the conversation yesterday. Per our conversation today, as you advised you no longer have a position here in HR for me.

Although you advised that I accept the position that Charita Thomas called me about last week, I reached out to Division of Finance yesterday evening after our chat and Jose Mercado is willing to carve out a position for me in Finance.

I spoke with Jose Mercado this morning again, and he said Finance has over 30 vacancies. He has a lot of work and projects – (a few examples, lead the 9th and 10th floor renovation and seating and spacing project; work with the PS budget team to re-align all the Finance staff Civil Service titles; Work with and coordinate all staff professional/licensing training; work with supervisors to determine all training needs for staff; work with supervisors to ensure staff contracts, Tasks and Standard and PEs are issues/completed; ensure supervisors are trained in the appropriate HR systems and Policies, etc. I would prefer to work in Finance which is a field that compliments the Human Resources field.

He has already identified an office for me. Since I have only 2 weeks to vacate my current office, I would like to come into the office this weekend 4/27 to start packing my current office.

(Marcus Decl., Ex. YY (Apr. 26, 2019 email) (Dkt. No. 77-51) at 2)

After Hester learned that Mercado – the Acting Deputy Commissioner for the Division of Finance (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 253) – was contemplating hiring Plaintiff, she asked Mercado to "hold off." Hester believed that Mercado's hiring of Plaintiff would conflict with Hansell's objective that Human Resources "make hiring decisions" without the "approval from Finance." (Marcus Decl., Ex. D (Krauss Dep.) (Dkt. No. 77-4) at 226-27)

Plaintiff did not obtain a position in the Department of Finance. On June 3, 2019, she transferred to the Department of Administration, where she is currently employed as the Executive Director of Policy and Planning. (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 9, 263)

## II.    **PROCEDURAL HISTORY**

The Complaint was filed on November 27, 2019 (Dkt. No. 1), and the Amended Complaint was filed on December 14, 2020. (Dkt. No. 51)

The Amended Complaint pleads the following claims: (1) a Rehabilitation Act disability discrimination claim against the City of New York; (2) a Rehabilitation Act retaliation claim against the City of New York; (3) an FMLA interference claim against all Defendants; (4)

an FMLA retaliation claim against all Defendants; (5) NYSHRL disability and age

discrimination claims against all Defendants; (6) NYCHRL disability and age discrimination

claims against all Defendants; (7) NYSHRL and NYCHRL retaliation claims against all

Defendants.  (Am. Cmplt. (Dkt. No. 51))

        Defendants moved for summary judgment on February 5, 2021.  (Dkt. No. 74)

On September 19, 2023, this Court referred Defendants' motion to Judge Willis for an R&R.

(Dkt. No. 90)  On March 26, 2024, Judge Willis issued an R&R recommending that Defendants'

motion be granted in part and denied in part.  (Dkt. No. 95)

        On May 9, 2024, Defendants filed objections to the R&R.  (Dkt. No. 99)  Plaintiff

filed no objections to the R&R, but responded to Defendants' objections on June 6, 2024.  (Dkt.

No. 102)

## DISCUSSION

I.     **LEGAL STANDARDS**

    A.    **Review of Magistrate Judge's Report & Recommendation**

        Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), a party may submit

objections to a magistrate judge's R&R.  Any objection must be "specific" and "written," and

must be made "[w]ithin 14 days after being served with a copy of the recommended disposition."

Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1).

        A district court reviewing a magistrate judge's report and recommendation "may

accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge."  28 U.S.C. § 636(b)(1)(C).  "'The district judge evaluating a magistrate

judge's recommendation may adopt those portions of the recommendation, without further

review, where no specific objection is made, as long as they are not clearly erroneous.'"

Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1

(S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F.

Supp. 2d 208, 212 (S.D.N.Y. 2003)).  A decision is "clearly erroneous" when, "upon review of

the entire record, [the court is] left with the definite and firm conviction that a mistake has been

committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and

citation omitted).

        Where, as here, a timely objection has been made to a magistrate judge's R&R,

the district court "shall make a de novo determination of those portions of the report or specified

proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).

However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage

the district court in a rehashing of the same arguments set forth in the original [papers] will not

suffice to invoke de novo review.'" Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211

(S.D.N.Y. 2013) (quoting Vega v. Artuz, 97CIV.3775LTSJCF, 2002 WL 31174466, at *1

(S.D.N.Y. Sept. 30, 2002)) (second alteration in Phillips).  "To the extent . . . that the party

makes only conclusory or general arguments, or simply reiterates the original arguments, [a

court] will review the Report strictly for clear error." IndyMac Bank, F.S.B. v. Nat'l Settlement

Agency, Inc., No. 07 Civ. 6865 (LTS)(GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008)

(citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343(WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan.

6, 2003) and Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan, 806 F. Supp. 380, 382

(W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008)

("Reviewing courts should review a report and recommendation for clear error where objections

are merely perfunctory responses, . . . rehashing . . . the same arguments set forth in the original

petition." (quotation marks and citations omitted)).

### B.  Rule 56 Motions for Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted). "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Mags., Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quotation marks and citation omitted).  However, a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.  Mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks, alterations, and citation omitted). "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13-CV-6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

A moving party can demonstrate the absence of a genuine issue of material fact "in either of two ways:  (1) by submitting evidence that negates an essential element of the non-

moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quotation marks and citation omitted)

## II.    THE REPORT AND RECOMMENDATION

Judge Willis recommends that Defendants' summary judgment motion be granted in part and denied in part.  (R&R (Dkt. No. 95) at 1)  According to Judge Willis, Defendants are entitled to summary judgment on (1) the Rehabilitation Act claims against Hansell, Krauss, Waddy, and Hester;[4] (2) the Rehabilitation Act, NYSHRL, and NYCHRL failure to accommodate claims premised on Plaintiff's uterine fibroids; (3) the NYSHRL and NYCHRL age discrimination claims; and (4) the FMLA interference claim.  (Id. at 45)  As noted above, Plaintiff has not objected to any of these recommendations.

Judge Willis further recommends that Defendants' summary judgment motion be denied as to (1) the Rehabilitation Act, NYSHRL, and NYCHRL failure to accommodate claims premised on Plaintiff's back pain; (2) the NYSHRL and NYCHRL disability discrimination claims; and (3) the Rehabilitation Act, FMLA, NYSHRL, and NYCHRL retaliation claims. Defendants object only to Judge Willis's recommendation concerning the Rehabilitation Act, FMLA, NYSHRL, and NYCHRL retaliation claims.  (Def. Obj. (Dkt. No. 99) at 7)

---

[4]  Although Judge Willis recommends that the individual Defendants be granted summary judgment on Plaintiff's Rehabilitation Act claims (R&R (Dkt. No. 95) at 15), the Amended Complaint's Rehabilitation Act claims are brought solely against the City of New York.  (Am. Cmplt. (Dkt. No. 51) ¶¶ 149-58)

III.    **DEFENDANTS' OBJECTIONS TO THE R&R**

    A.    **Defendants' Objections Regarding the Rehabilitation Act, NYCHRL, and NYSHRL Retaliation Claims**

        Defendants contend that Judge Willis erred in recommending that they be denied summary judgment on Plaintiff's Rehabilitation Act, NYSHRL, and NYCHRL retaliation claims. According to Defendants, Judge Willis improperly relied on the "close temporal proximity between the alleged protected activity and the alleged adverse actions" in making this recommendation. (Def. Obj. (Dkt. No. 99) at 8)  More specifically, Judge Willis erred in (1) finding a sufficient causal nexus between Plaintiff's November 2019 Complaint in the instant action and the selection of Brandon Respress for the Assistant Commissioner of Recruitment and Retention position in April 2020; (2) considering Plaintiff's FMLA leave in March and April 2019 in connection with her NYSHRL and NYCHRL retaliation claims, because FMLA leave is not a protected activity under these statutes; and (3) not analyzing whether (a) Defendants have proffered legitimate, non-retaliatory reasons for their actions; and (b) Plaintiff has adequately shown that Defendants' alleged non-retaliatory reasons for their actions are pretextual. (Id. at 12-18)

        1.    **Applicable Law**

        To establish a prima facie claim of retaliation under the Rehabilitation Act, the NYSHRL, and the NYCHRL, "a plaintiff must plausibly allege that:  (1) he suffered a materially adverse employment action, (2) he participated in a protected activity [under these statutes]; and (3) the adverse employment action is causally connected to his participation in the protected activity." Mitchell v. New York City Dep't of Educ., No. 20CIV1555PGGSLC, 2021 WL 8013770, at *9 (S.D.N.Y. May 7, 2021), R&R adopted sub. nom. Dwain Mitchell v. New York City Dep't of Educ., No. 20 CIV. 1555 (PGG), 2022 WL 621956 (S.D.N.Y. Mar. 3, 2022); see

also Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012) ("[A]

prima facie case of retaliation faces the same requirements under the NYCHRL as under the

NYSHRL")

"An adverse employment action in the context of retaliation is different than in

the context of discrimination." Sosa v. N.Y.C. Dep't of Educ., 368 F. Supp. 3d 489, 517

(E.D.N.Y. 2019). In the retaliation context, "an adverse employment action is any action that

could well dissuade a reasonable worker from making or supporting a charge of discrimination."

Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 90 (internal citation omitted).

As for the causation element, "a close temporal relationship between a plaintiff's

participation in protected activity and an employer's adverse actions can be sufficient to establish

causation." Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002).

Once a plaintiff establishes a prima facie case of retaliation, "the burden shifts to

the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment

decision." Treglia, 313 F.3d at 721. If a defendant meets this burden, "'the plaintiff must point

to evidence that would be sufficient to permit a rational factfinder to conclude that the

employer's explanation is merely a pretext for impermissible retaliation.'" Id. (quoting Cifra v.

G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001). A plaintiff must meet the "ultimate burden of

proving 'that the desire to retaliate was the but-for cause of the challenged employment action.'"

Sivio v. Vill. Care Max, 436 F. Supp. 3d 778, 799 (S.D.N.Y. 2020) (quoting Univ. of Texas Sw.

Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)).

"[T]he standards for evaluating . . . retaliation claims are identical under the

NYSHRL . . . and [the Rehabilitation Act]." Id. (quotation marks omitted) (citing Vasquez v.

Empress Ambulance Serv., Inc., 835 F.3d 267, 271 n.3 (2d Cir. 2016). Under the NYCHRL,

however, "summary judgment is appropriate [only] if 'the record establishes as a matter of law'

that discrimination <u>or</u> retaliation 'play[ed] no role' in the defendant's actions." <u>Ya-Chen Chen v.</u>

<u>City Univ. of New York</u>, 805 F.3d 59, 76 (2d Cir. 2015) (quoting <u>Mihalik v. Credit Agricole</u>

<u>Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 110 n.8 (2d Cir. 2013) (alteration and emphasis in

original)).

        2.      **<u>Analysis</u>**

            a.    **Causal Connection between the Filing of the November 2019**
                    **Complaint and the Failure to Select Plaintiff for the Assistant**
                    **<u>Commissioner of Recruitment and Retention Position</u>**

        Defendants contend that Judge Willis erred in making "a finding of causation by

temporal proximity," given "the nearly five month gap between when Plaintiff filed this lawsuit

and when she was not selected for the Assistant Commissioner of [Recruitment and Retention]

position [in April 2020]." (Def. Obj. (Dkt. No. 99) at 14-15)

        Defendants raised this same argument in their original briefing on the summary

judgment motion, which Judge Willis rejected. (<u>Compare</u> Def. Br. (Dkt. No. 75) at 23-34, <u>with</u>

Def. Obj. (Dkt. No. 99) at 14-15) Because Defendants are "rehashing . . . the same arguments

set forth in the original [papers]," <u>Phillips</u>, 955 F. Supp. 2d at 211, this Court reviews this portion

of the R&R only for clear error.

        In concluding that Plaintiff has established the causation element of her <u>prima</u>

<u>facie</u> case, Judge Willis reasons as follows:

> [W]ith respect to the denial of the Assistant Commissioner position,
> approximately 5 months passed between the filing of this lawsuit and the selection
> of [Brandon] Respress for the position. This is similar to the scenario described
> in [<u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 110 (2d Cir. 2010)], where
> five months was deemed not too long to support a causal relationship. Therefore,
> this Court finds that the causal link is satisfied.

(R&R (Dkt. No. 95) at 42-43)

While the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," it has held – as Judge Willis notes – that "five months is not too long to find the causal relationship." Gorzynski, 596 F.3d at 110; see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 555 (2d Cir. 2001) (holding that "five months is not too long" to support the element of causation); Ibok v. Sec. Indus. Automation Corp., 369 F. App'x 210, 214 (2d Cir. 2010) (summary order) (stating that plaintiff could "establish a prima facie case of retaliation" at summary judgment based on a temporal relationship of "roughly five months" between complaining about racial discrimination and being fired).

Given this Second Circuit authority, this Court cannot find that Judge Willis committed "clear error" in concluding that "five months was . . . not too long to support a causal relationship." (R&R (Dkt. No. 95) at 42-43) Accordingly, Defendants' objection is overruled.

**b.      Whether Taking FMLA Leave Is a "Protected Activity"**

Defendants also contend that "[t]aking FMLA leave is not a protected activity under the [NY]SHRL or [NY]CHRL," and accordingly Judge Willis erred in

> deny[ing] summary judgment as to the [NY]SHRL and [NY]CHRL claims on the basis that Plaintiff's FMLA leave from March 20, 2019 to April 15, 2019 was in close proximity to Plaintiff being told on April 24, 2019 that she had no more work to do and had until May 9, 2019 to vacate her office.

(Def. Obj. (Dkt. No. 99) at 13-14)

But Judge Willis did not rely on Plaintiff's March 20, 2019 to April 15, 2019 FMLA leave in finding temporal proximity:

> With respect to the denial of the Associate Commissioner position and the alleged reassignment of Plaintiff's duties as "Chief of Staff," this Court has already determined that these allegations could rise to the level of materially adverse employment actions. Considering the close proximity of these events to Plaintiff's First Leave [from September 11, 2018 through September 14, 2018] and Plaintiff's Second Leave [from December 18, 2018 to January 2, 2019], this

Court believes that a causal link exists. These intervals are similar to the periods at issue in the cases which found that the passage of a few months was sufficient to raise an inference of causation. See, e.g., Treglia, 313 F.3d at 720; Quinn, 159 F.3d at 769.

Similarly, with respect to the denial of the Assistant Commissioner position, approximately 5 months passed between the filing of this lawsuit and the selection of Respress for the position. This is similar to the scenario described in Gorzynski, 596 F.3d at 110 (2d Cir. 2010), where five months was deemed not too long to support a causal relationship. Therefore, this Court finds that the causal link is satisfied.

Given the extreme temporal proximity between the protected activity and the adverse acts, Plaintiffs have introduced sufficient evidence that "a reasonable juror could infer retaliatory intent." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2nd Cir. 2002).

(R&R (Dkt. No. 95) at 42-43) In sum, Judge Willis did not rely on Plaintiff's March 20, 2019 to April 15, 2019 FMLA leave in concluding that Plaintiff had adequately demonstrated a causal connection.

Accordingly, Defendants' objection is overruled.

### c.    <u>Legitimate, Non-Retaliatory Reasons and Pretext</u>

Defendants complain that Judge Willis did not consider whether (1) Defendants had offered legitimate, non-retaliatory reasons for their conduct under the second step of the McDonnell Douglas analysis; and (2) Plaintiff met her burden of showing that the proffered reasons were pretextual under the third step of the McDonnell Douglas analysis. (Def. Obj. (Dkt. No. 99) at 12-13, 15-18) Defendants raised these issues in their summary judgment briefing (see Def. Br. (Dtk. No. 75) at 24-25), but Judge Willis does not address them in her R&R. (See R&R (Dkt. No. 95) at 40-43) Accordingly, this Court considers these issues de novo.

It is undisputed here that Plaintiff has properly alleged three protected activities: (1) her request for medical leave in August 2018, which Plaintiff alleges solely for purposes of

her Rehabilitation Act retaliation claim; (2) Plaintiff's January 23, 2019 ACS EEO Complaint;

and (3) the November 21, 2019 filing of the instant Complaint.  (R&R (Dkt. No. 95) at 40-41)

It is likewise undisputed that Plaintiff suffered three adverse employment actions:

(1) not being selected for the Associate Commissioner of Human Resources position in October

2018; (2) being "functional[ly] demot[ed] and remov[ed]" from the ACS Human Resources

Division between January 2019 and April 2019; and (3) not being selected for the Assistant

Commissioner of Recruitment and Retention position in April 2020.  (Id.)

Defendants have proffered the following non-retaliatory reasons for these actions.

As for the decision not to select Plaintiff for the Associate Commissioner position in October

2018, Defendants contend that "the final round panelists (Hansell, Krauss, and non-party ACS

First Deputy Commissioner Eric Brettschneider) concluded [that] Plaintiff was not the best

candidate for the position because on prior occasions she had given confusing information to

cabinet-level officials during [a] cabinet meeting."  (Def. Obj. (Dkt. No. 99) at 16)

With respect to Plaintiff's functional demotion and transfer out of Human

Resources, Defendants proffer two explanations:  (1) "the title change was part of an effort by

the new Associate Commissioner for Human Resources Melissa Hester to improve the

functioning of the HR Division, and, as Hester explained in an email to Plaintiff, she changed

Plaintiff's title because 'the lines are blurred in some areas and staff are confused as where the

reporting lines are at this point and I want everything to be as clear as possible as I am making

changes'" (id. at 17 (quoting Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 202, 203)); and (2) by April

2019, "Plaintiff and Hester had been discussing Plaintiff's departure from the HR Division since

January 2019 when Plaintiff herself proposed she leave the Division."  (Id.) (emphasis in

original)

Finally, with respect to the decision not to select Plaintiff for the Assistant Commissioner of Recruitment and Retention position in April 2020, Defendants cite Respress's qualifications for the job and the fact that he "had previously been the Director of Recruitment and Retention" at ACS. (Id. at 17-18)

Defendants further contend that "a finding of temporal proximity alone is insufficient to show legitimate, non-retaliatory reasons for an adverse action are pretext." (Id. at 12 (citing Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014) ("temporal proximity alone is not enough to establish pretext" at the third stage of the McDonnell Douglas analysis); Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage."); El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . . but without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext.").

Here, however, Plaintiff has proffered evidence that goes beyond mere "temporal proximity" in arguing that Defendants' proffered reasons for their adverse actions are pretextual.

As to the failure to select Plaintiff for the Associate Commissioner position in October 2018, for example, the record contains the following evidence:

> Plaintiff's impressive educational credentials, which include a master's degree and a doctorate from Harvard (R&R (Dkt. No. 95) at 2);
>
> Plaintiff's experience working as a Human Resources Manager at ACS since 2008, and as the Executive Director and Chief of Staff of Human Resources at ACS since 2012 (id. at 7; Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 7-8);
> the selection of Plaintiff and her service as the Acting Assistant Commissioner of Human Resources in 2015 and 2018 – the same position for which she was interviewing in 2018 (albeit with a different title) (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 12, 30);

the fact that Krauss had recommended to Hansell that Plaintiff serve in the Acting
Assistant Commissioner position in July 2018, just one month before Plaintiff's August
2018 leave request (id. ¶ 30);

Plaintiff's testimony that Krauss was "bullying" her, "looked visibly upset or angry," and
"turned red" during their August 21, 2018 meeting to discuss Plaintiff's leave request
(Pltf. Dep. (Dkt. No. 83-1) at 63);

Defendant Waddy's August 21, 2018 text message stating that she became "livid" when
she "saw [Plaintiff's] out of office" message, and her comment that "in the midst of all of
this she is interviewing?!?! Wtf" (Marcus Decl., Ex. 26 (Aug. 21, 2018 text messages)
(Dkt. No. 77-26) at 2);

Waddy's September 28, 2018 email to Krauss stating that Plaintiff's September 11 to 14,
2018 sick leave "may indicate future behavior" (Maduegbuna Decl., Ex. 21 (Sept. 28,
2018 email) (Dkt. No. 83-21) at 2);

Plaintiff's declaration stating that she never provided inaccurate information to cabinet
members, which is one of Defendants' proffered reasons for failing to promote her
(Maduegbuna Decl., Ex. 4 (Pltf. Decl.) (Dkt. No. 83-4) ¶¶ 12-14); and

the testimony of Jodi Savage – the Director of the ACS EEO Office – that "disability
rights is something that the agency definitely doesn't value"; that she "constantly face[s]
a lot of pushback on reasonable accommodations"; that "there is just a general attitude,
you know, that people who request [reasonable accommodations] are malingerers"; and
that she has experienced "pushback" from within ACS with disability complaints that she
has not received for complaints related to race, age, or gender. (Oct. 27, 2020 Savage
Dep. Tr., Maduegbuna Decl. Ex. 3 (Dkt. No. 83-3) at 35, 69-73)

       Given this evidence – and the fact that there is only a two-month gap between

Plaintiff's August 2018 leave request and the October selection of Hester as Associate

Commissioner – this Court concludes that there are genuine issues of material fact as to whether

Defendants' proffered reasons are pretextual.

       With respect to Plaintiff's title change and "functional demotion" in January

2019, much of the same evidence is relevant. In addition, a jury could consider that by January

2019, Plaintiff had taken (1) sick leave between September 11, 2018 and September 14, 2018;

(2) sick leave between December 5, 2018 and December 7, 2018; and (3) vacation leave between

December 18, 2018 and January 2, 2019. (Maduegbuna Decl., Ex. 30 (Haynes Leave Requests

Report) (Dkt. No. 77-30) at 2; Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 139, 201)  And when Hester assumed her duties as the new ACS Associate Commissioner of Human Resources, she, Krauss, and Waddy began weekly meetings to discuss "priorities" in the Human Resources Division – meetings to which Plaintiff was not invited.  (Maduegbuna Decl., Ex. 15 (Hester Dep.) (Dkt. No. 83-15) at 120-21)

Moreover, at a January 8, 2019 meeting during which Hester explained to Plaintiff her new role in Human Resources, Hester told Plaintiff that she "had PTSD" and "need[ed] time to rejuvenate in a different role."  (Pltf. Dep. (Dkt. No. 83-1) at 79)  Hester's "PTSD" comment could be understood as reflecting Hester's belief that Plaintiff's requests for medical leave demonstrated exhaustion or a lack of capacity.

Plaintiff's removal from the Human Resources Division took place only three months' later – in April 2019 – about two weeks after Plaintiff's March 22, 2019 to April 12, 2019 FMLA leave to address her uterine fibroids.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 239-241)  And while Plaintiff had requested a new role at ACS in January 2019, she also made clear at that time that she believed that she was being "forced out" of Human Resources, and that her "current and future role in HR is untenable, unworkable, and humiliating."  (Marcus Decl., Ex. 46 (Jan. 23, 2019 email) (Dkt. No. 77-46) at 3); see also Pltf. Dep. (Dkt. No. 83-1) at 96 (Plaintiff testifying that she had "loved working in Human Resources" and "never wanted to move out of Human Resources.")

In sum – as to Plaintiff's title change and "functional demotion" in January 2019 – there are genuine issues of material fact as to whether Defendants' explanations for their actions are pretextual.

Finally, as to Defendants' decision not to select Plaintiff for the Assistant

Commissioner of Recruitment and Retention position, all of the evidence discussed above is

relevant to the issue of pretext.  Plaintiff applied for the Recruitment and Retention position in

the summer of 2018, when she was serving as the Acting Assistant Commissioner of Human

Resources.  (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 272)  Both Hansell and the second-round

interview panelists for the Associate Commissioner position recommended that Plaintiff be

encouraged to apply for the Recruitment and Retention position.  (Marcus Decl., Ex. P (Sept. 7,

2018 Ferrero email) (Dkt. No. 77-16) at 2; Pltf. Dep. (Dkt. No. 83-1) at 45)  Although Hester

interviewed at least one candidate for the Recruitment and Retention position in February 2019,

she did not interview Plaintiff, even though Plaintiff had applied for the position.  (Def. R. 56.1

Stmt. (Dkt. No. 76) ¶¶ 272-77)  A reasonable jury could conclude that Defendants' decision to

hire Brandon Respress for the position in April 2020 – and Defendants' continued refusal to

grant Plaintiff an interview – reflects a course of conduct that began much earlier.

In sum, there are genuine issues of material fact as to whether Defendants'

explanations for not selecting Plaintiff for the Recruitment and Retention position are pretextual.

Accordingly, Defendants' objection is overruled.

**B.**     **Defendants' Objection Regarding the FMLA Retaliation Claim**

As to Plaintiff's FMLA retaliation claim, Defendants complain that Judge Willis

"does not analyze Defendants' legitimate non-retaliatory explanations for Plaintiff being told on

April 24, 2019 that she had no more work to do and had until May 9, 2019 to vacate her office."

(Def. Obj. (Dkt. No. 99) at 19)

The Second Circuit analyzes FMLA retaliation claims

under the burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411
U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  "To establish a prima faci[e]
case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights

protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 147 (2d Cir.2012) (internal quotation marks omitted).  If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual.  See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996).

Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 429 (2d Cir. 2016) (citations and footnotes omitted).  A "'motivating factor' causation standard" applies to FMLA retaliation claims. Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 166 (2d Cir. 2017).

Here, Judge Willis acknowledges the "motivating factor" standard of causation (R&R (Dkt. No. 95) at 43-44 (citing Woods, 864 F.3d at 167-69), but she does not address Defendants' proffered non-retaliatory reasons or analyze whether those explanations are pretextual.  Applying the "motivating factor" standard, Judge Willis recommends that Defendants' summary judgment motion be denied as to this claim.  (Id.)

As to the causation issue, this Court reviews the R&R for clear error.  As to Defendants' proffered non-retaliatory reasons and pretext, this Court reviews the R&R de novo.

As an initial matter, Defendants do not dispute that Plaintiff's March 22, 2019 to April 12, 2019 FMLA leave is a protected activity under the FMLA.  (See Def. Obj. (Dkt. No. 99) at 19)  Nor do they dispute that when "Hester told [Plaintiff in April 2019, after Plaintiff returned from her FMLA leave,] that [Plaintiff] needed to leave the office in two weeks," this action constituted "adverse action" for purposes of an FMLA retaliation claim.  (Id.; Def. R. 56.1 Stmt. (Dkt. No. 76) ¶ 241)  And for all of the reasons stated above in connection with Plaintiff's Rehabilitation Act, NYSHRL, and NYCHRL retaliation claims, there is sufficient evidence for a reasonable juror to conclude that Plaintiff's FMLA leave was a motivating factor behind Defendants' actions in April 2019, and that Defendants' proffered explanations are pretextual.

Accordingly, there are genuine issues of material fact regarding the causation and pretext elements of Plaintiff's FMLA retaliation claim, and Defendants' objection is overruled.

## IV.    REMAINING RECOMMENDATIONS IN THE R&R

No party has objected to the remaining recommendations in the R&R, which this Court has reviewed only for clear error.

### A.    Rehabilitation Act Claims Against Individual Defendants

Judge Willis recommends that this Court grant the individual Defendants summary judgment on Plaintiff's Rehabilitation Act claims.  (R&R (Dkt. No. 95) at 15)  As noted above, the Amended Complaint does not plead Rehabilitation Act claims against the individual Defendants; only the City of New York is named as a defendant in these claims.  (Am. Cmplt. (Dkt. No. 51) ¶¶ 149-155)

In any event, Section 504 of the Rehabilitation Act does not provide for "individual capacity suits against state officials."  Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); see also MC v. Arlington Cent. Sch. Dist., No. 11-CV-1835 CS, 2012 WL 3020087, at *9 n.18 (S.D.N.Y. July 24, 2012) ("To the extent Plaintiffs attempt to bring their claims against the individually-named Defendants in their individual capacities, they may not do so, as . . . Section 504 [does not] provide[] for individual liability.").  Accordingly, to the extent that the Amended Complaint could be construed as pleading Section 504 claims against the individual Defendants, they are entitled to summary judgment on those claims.

### B.    Failure to Accommodate Claims

Plaintiff alleges that Defendants discriminated against her in violation of the Rehabilitation Act, the NYSHRL, and the NYCHRL by denying her a reasonable accommodation – medical leave – in August 2018 in connection with (1) her uterine fibroids;

and (2) back pain stemming from a herniated disk.  (Am. Cmplt. (Dtk. No. 51) ¶¶ 154(a), 172,

176)

Judge Willis recommends that Defendant be granted summary judgment on

Plaintiff's failure to accommodate claim to the extent that claim is premised on her uterine

fibroid condition.  According to Judge Willis, that condition does not qualify as a disability

under the Rehabilitation Act, and Defendants were not given notice of her fibroid condition

under the NYSHRL and NYCHRL.  (R&R (Dkt. No. 95) at 16-20)  To the extent that Plaintiff's

failure to accommodate claim is premised on her herniated disk, Judge Willis recommends that

Defendants' motion be denied.  (Id. at 45)

### 1.    Applicable Law

To establish a prima facie case for a failure to accommodate claim under the

Rehabilitation Act, a plaintiff must show "(1) that he is an individual who has a disability within

the meaning of the statute, (2) that an employer covered by the statute had notice of his

disability, (3) that with reasonable accommodation, he could perform the essential functions of

the position sought, and (4) that the employer has refused to make such accommodations."

Stone v. City of Mount Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997); see also 29 U.S.C. § 794(d)

(Rehabilitation Act is to be interpreted in accordance with the standards applied under the ADA).

Where a plaintiff has established a prima facie case, "[t]he employer can defeat the claim if it

shows (a) that making a reasonable accommodation would cause it hardship, and (b) that the

hardship would be undue.  The burden of proof on these two issues is on the employer." Stone,

118 F.3d at 97.  "Courts apply the same standard for failure to accommodate cases under the

ADA, Rehabilitation Act, NYSHRL, and NYCHRL." Lawtone-Bowles v. City of New York,

No. 17CV8024, 2019 WL 652593, at *6 (S.D.N.Y. Feb. 15, 2019).

Under the Rehabilitation Act, an employer and an employee are required to engage in an "interactive process" by which they "work together to assess whether an employee's disability can be reasonably accommodated." Jackan v. New York State Dep't of Lab., 205 F.3d 562, 566 (2d Cir. 2000). As a result – even where a plaintiff has made out a prima facie case – "liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the break down" of the interactive process. Economou v. Caldera, No. 99 CIV. 12117 AJP, 2000 WL 1844773, at *24 (S.D.N.Y. Dec. 18, 2000) (quoting Beck v. Univ. of Wisc. Bd. of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)). Where a breakdown in the interactive process has taken place, "courts should look for signs of [a] failure to participate in good faith or [a] failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." Young v. Cent. Square Cent. Sch. Dist., 213 F. Supp. 2d 202, 214 (N.D.N.Y. 2002). An employer impedes the interactive process when "the employer knows of the employee's disability, the employee requests accommodations or assistance[,] the employer does not in good faith assist the employee in seeking accommodations[,] and the employee could have been reasonably accommodated but for the employer's lack of good faith." Goonan v. Fed. Rsrv. Bank of New York, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013). And an employee will prevail on a failure to accommodate claim where "defendant's statements effectively indicated that the [defendant] had no intention of engaging in the interactive process in good faith." Sivio, 436 F. Supp. 3d at 795 (internal quotations and citations omitted).

    2.    **Analysis**

        a.    **Uterine Fibroid Condition**

Judge Willis concludes that Plaintiff's uterine fibroid condition does not qualify as a disability under the Rehabilitation Act. She reasons as follows:

Defendants argue that fibroids do not substantially limit a major life activity as "the need to urinate frequently is not a disability recognized by the courts." Dkt. No. 75 at 14-15 (citing Hamm v. Farney, 2017 U.S. Dist. LEXIS 211573, *34-35 (N.D.N.Y. Dec. 22, 2017) adopted by 2018 U.S. Dist. LEXIS 25622 (N.D.N.Y. Feb. 16, 2018) (quoting Giles v. NBC Universal, Inc., 2011 U.S. Dist. LEXIS 106171, 2011 WL 4376469, at *5 (S.D.N.Y. Sept. 20, 2011)) (collecting cases)).

Plaintiff counters that her fibroids cause frequent urination every 15 to 20 minutes[,] which interferes with her ability to work, establishing her fibroids as a disability under the Rehab Act.  Opp. at 16.  Plaintiff relies on an Eleventh Circuit case to argue that fibroids could rise to the level of a disability under the Rehab Act.  See Id. (citing Munoz v. Selig Enterprises, Inc., 981 F.3d 1265, 1273 (11th Cir. 2020)).

In Munoz, the Eleventh Circuit declined to find that uterine fibroids were a disability where the record lacked evidence of "timing, frequency, and duration of [plaintiff's] impairments" and the plaintiff failed to provide evidence of "how long she experienced the symptoms."  See Munoz, 981 F.3d at 1272-1273 (cleaned up).  Plaintiff believes the frequency of urination demonstrates the timing, frequency, and duration of impairments, thus establishing that her fibroids qualify as a disability.  However, Plaintiff failed to provide any evidence as to how long she experienced these symptoms.  Dkt. No. 78 at 6; see Munoz, 981 F.3d at 1272-1273.

In this District, courts have ruled that "the need to urinate frequently is not a disability," if the plaintiff does not produce adequate evidence to show "substantial limits."  See, e.g., Spruill v. New York City Health and Hosps. Corp., No. 06-CV-11362 (WHP), 2008 WL 3911015, at *3 (S.D.N.Y. 2008) (declining to recognize plaintiff's disability because plaintiff did not show his "medication-induced need to urinate frequently substantially limit[ed] any major life activity"); Giles v. NBC Universal, Inc., No. 10-CV-7461 (DAB), 2011 WL 4376469, at *5 (S.D.N.Y. 2011) (holding that plaintiff has not alleged facts to show his kidney condition is a disability, as he fails to allege that it "substantially" limits his ability to engage in major life activities; simply put, the need to urinate frequently is not a disability recognized by the courts); Lewis v. Hill, No. 97-CV-3213 (DAB), 2005 WL 292748, at *4 (S.D.N.Y. Feb. 8, 2005).

Here, Plaintiff argues that the fibroids caused frequent urination every 15 to 20 minutes, which she argues "shows interference with her ability to work and concentrate."  Opp. at 16.  However, the record provides no details about how the frequent urination interferes with her major life activities.  In fact, when asked during her deposition whether her uterine fibroids affected her in any way, Plaintiff only responded, "the uterine fibroid started off as a small fibroid and over the course of a few months it grew by August of 2018, it had grown all the way to a size of a four-month old fetus and it was affecting [her] bladder."  Dkt. No. 77-2 at 13.  To survive a motion for summary judgment, Plaintiff needed to

introduce more evidence into the record connecting the frequent urination to the major life activities she claims were limited.

(R&R (Dkt. No. 95) at 16-18)

Because Plaintiff has proffered no evidence demonstrating how – if at all – her frequent urination interferes with major life activities, this Court finds no error in Judge Willis's analysis.

Judge Willis also concludes that Plaintiff did not provide Defendants with adequate notice of her uterine fibroid condition under the NYSHRL and NYCHRL. She reasons as follows:

> [W]ith respect to Defendants' notice about the fibroids, Plaintiff testified that she told Defendant Waddy on August 8, 2018 that she "had some fibroids that [she] needed to attend to." Dkt. No. 83-1 at 16. Plaintiff also points to testimony of a non-Defendant who alleges she was told by Plaintiff that she was seeking medical leave for fibroids. Opp. at 17; Dkt. No. 83-2 at 12. Plaintiff also says that in a meeting with Krauss, Plaintiff told Krauss that [she required] multiple leaves, one immediate and one longer term, and Plaintiff claims Krauss "admitted in her deposition that Haynes told her she had a medical procedure she wanted to address." Pl. SMF at 42 (citing Dkt. No. 83-12, Krauss Tr. at 69:11-12). However, Plaintiff admits that "she did not tell Commissioner Hansell that she needed time off in order to deal with her medical issues." Pl. SMF at 54 ¶) 1125. On balance, in this Court's view, this is insufficient to establish a <u>prima facie</u> claim of notice of Plaintiff's fibroids as a disability.
>
> The key email, the August 2018 Leave Request, only says that Plaintiff was seeking medical leave for "a great deal of pain due to 2 herniated discs and 1 bulging disk." Dkt No. 77-24 at 2. It mentions nothing about the fibroids. Thus, this Court does not believe that Plaintiff has demonstrated sufficient evidence that Defendants Hansell or Krauss were on notice that she sought leave related to her fibroids.
>
> The fact that the email does not mention anything about the fibroids is key, because pursuant to the Amended Complaint, Defendants Hansell and Krauss were the decisionmakers who denied Plaintiff's request for leave. Dkt. No. 51 at 12. A plaintiff must offer evidence to support a claim that a "decisionmaker" had knowledge of the disability when the relevant determination was made. See <u>Kolivas v. Credit Agricole</u>, No. 95-CV-5662 (DLC), 1996 WL 684167, at *4 (S.D.N.Y.,1996). Since the email is the key piece of evidence connecting Krauss and Hansell to the request for leave, the absence of any reference to the fibroids

> means there is no evidence in the record suggesting they were aware of the fibroid
> issue.
>
> Plaintiff says she told Waddy about the fibroids, and generally, it may be
> reasonable to assume that an employee in Waddy's position would have
> communicated this to her superiors Hansell and Krauss.  See Opp. at 17.
> However, here, because the email from Krauss referenced only the "herniated"
> and "bulging" discs, and the response referenced the "rest" that was needed
> specifically for the back, indicates that if Waddy communicated anything to **her?**
> superiors, it was only about the back.

(Id. at 19-20)

As an initial matter, Plaintiff has conceded that "Hansell was not aware that

[P]laintiff had a fibroid condition," and that "Plaintiff did not tell Krauss that she had a fibroid

condition." (Def. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 134-35)  And this Court agrees that there is no

evidence that Waddy was a decisionmaker regarding Plaintiff's August 2018 leave request.

When Plaintiff raised the leave issue with Waddy, Waddy referred Plaintiff to Krauss.  (Id.

¶ 100-101)  Moreover, Krauss led the August 2021 meeting with Plaintiff regarding her leave

request (Pltf. Dep. (Dkt. No. 83-1) at 62)[5]; Krauss responded to Plaintiff's emails regarding her

leave request (Marcus Decl., Ex. X (Aug. 17 to 21, 2018 email chain) (Dkt. No. 77-24) at 3);

Krauss told Plaintiff that she "was going to bring [Plaintiff's leave request] to the

Commissioner's attention" (Pltf. Dep. (Dkt. No. 83-1) at 67); and Krauss and Hansell – not

Waddy – were present for the meeting at which Hansell allegedly said, "I need you here. The

agency is in crisis."  (Id. at 67-68)  In sum, there is no evidence that Waddy told either Krauss or

Hansell about Plaintiff's fibroid condition.  Accordingly, this Court finds no error in Judge

Willis's determination that Plaintiff has not satisfied the notice requirement.

---

[5]  The parties dispute whether Waddy was present at this meeting.  Plaintiff testified that Waddy
was present at this meeting (id.), while Krauss testified that only she and Plaintiff attended this
meeting.  (Marcus Decl., Ex. D (Krauss Dep.) (Dkt. No. 77-4) at 87)

For all these reasons, Defendant's motion for summary judgment will be granted to the extent that Plaintiff's failure to accommodate claim is premised on her uterine fibroid condition.

### b.    Herniated Disk

Judge Willis recommends that Defendants' summary judgment motion concerning Plaintiff's failure to accommodate claim be denied to the extent that that claim is premised on Plaintiff's herniated disk condition.  (See R&R (Dkt. No. 95) at 45)

Defendants do not dispute that Plaintiff's herniated disk and resulting back pain qualifies as a disability under the Rehabilitation Act, the NYSHRL, and the NYCHRL.  Nor do Defendants dispute that – with a reasonable accommodation – Plaintiff could perform the essential functions of her position, and that Defendants refused to make such an accommodation. (Id. at 16; see Def. Br. (Dkt. No. 75) at 15-17).

As to notice, it is undisputed that Plaintiff emailed Krauss and Waddy on August 21, 2018 to request "vacation" partly in connection with "2 herniated discs and 1 bulging disk from my fall on the job." (Marcus Decl., Ex. X (Aug. 17 to 21, 2018 email chain) (Dkt. No. 77-24) at 3)  On August 22, 2018 – the next day – Krauss emailed Plaintiff and informed her that "[t]he Commissioner asked for an update" concerning Plaintiff's requested leave.  (Maduegbuna Decl., Ex. 23 (Aug. 22, 2018 email chain) (Dkt. No. 83-23) at 2)  While Defendants dispute whether Hansell had notice of Defendant's back condition (Def. Br. (Dkt. No. 75) at 30) – given the evidence that Krauss told Hansell about Plaintiff's leave request, a reasonable jury could infer that Krauss also informed Hansell about the reason for Plaintiff's leave request – i.e., that she was suffering from back pain.  Accordingly, this Court agrees with Judge Willis that there is a genuine issue of material fact as to whether Hansell was on notice of Plaintiff's herniated disk disability.  (See R&R (Dkt. No. 95) at 21)

As to whether either side engaged in conduct that led to a breakdown in the "interactive process," Judge Willis concludes that this issue cannot be resolved as a matter of law:

> Plaintiff allegedly only failed to respond to a single inquiry to "scale back" her leave request. Dkt No. 77-27. Additionally, in an email, Krauss acknowledged that in response to the scale-back inquiry, Plaintiff "requested I tell her what I would allow. I again asked her to let me know what is possible." Defendant Krauss did not provide alternative dates. Id.

> Both Parties agree that Plaintiff met with Defendant Hansell after Defendant Krauss requested a revised proposal. Plaintiff says Defendant Hansell's statements during the meeting "effectively indicated that the [Defendants] had no intention of engaging in the interactive process in good faith." Opp. at 18. On the other hand, Defendants maintain that Plaintiff's failure to provide a modified schedule prior to the meeting with Defendant Hansell led to a breakdown of the interactive process. Reply at 8. Thus, the issue turns on the content of the conversations and the credibility of the witnesses. This gives rise to a genuine dispute on a material issue of fact regarding the breakdown of the interactive process.

(R&R (Dkt. No. 95) at 24-25)  Given this record, this Court cannot find as a matter of law that Plaintiff is solely responsible for any breakdown in the parties' August 2018 discussions concerning her medical leave. This Court therefore finds no error in Judge Willis's recommendation.

Finally, Judge Willis finds that Defendants have not demonstrated as a matter of law that Plaintiff's request for leave in August 2018 presented an undue hardship to ACS:

> ACS appears to have been juggling several serious tasks during the relevant time period, but was able to allow other high-ranking employees to take leave. While there may be some dispute regarding whether Defendant Kraus[s] took a second leave, it is undisputed that Defendant Kraus[s] took annual leave from August 13th to 17th and again on August 20th. Pl. SMF at 35. It also is undisputed that the Deputy Commissioner of the facility where the Edwards Incident took place was allowed to take a 17-day vacation. Id.; see also Dkt. No. 83-25. Defendants try to distinguish this from Plaintiff's request by arguing that Deputy Commissioner [Farber's] leave was an unpaid leave, but Defendants fail to explain how this factors into the undue hardship analysis.

(Id. at 26)

There is evidence that the August 2018 Jacques Edwards incident created a crisis

at ACS, and that Plaintiff was tasked with helping to address the fallout from that incident.  For

example, Plaintiff "helped draft ACS's responses to the OCFS investigation" (Def. R. 56.1 Stmt.

(Dkt. No. 76) ¶ 93), and she assisted with "reviewing the files" of ACS employees "who had

prior felony convictions to determine if it was appropriate for them to be performing their

duties," and in order to "conduct[] background clearances for a large number of ACS staff."  (Id.

¶ 95; Maduegbuna Decl., Ex. 4 (Pltf. Decl.) (Dkt. No. 83-4) ¶¶ 18-19)  Accordingly, it is

reasonable to infer that Plaintiff's absence from ACS in August 2018 would have caused at least

some hardship to the agency.

Defendants have not proffered evidence of how much time Plaintiff spent on work

related to the Edwards incident as opposed to her regular duties, however.  Nor have Defendants

addressed whether ACS had personnel available to address Plaintiff's work in the event that she

went on leave.  Plaintiff, for her part, contends that Michael Ognibene, ACS's Chief

Effectiveness Officer, was "taking the lead" on the agency's response to the Edwards incident,

and that her

> involvement was mainly limited to ensuring that Ognibene's team were able to
> pull files.  The team reported its findings directly to Ognibene and [Eric
> Brettschneider, the ACS First Deputy Commissioner].
>
> Since the personnel files fell under HR, Ognibene was working with my team to
> pull the files.  He was not allowed to go into the file room with his team to pull
> the files.  All I was doing was making sure that my team was accessible to him to
> pick up the files and return them to HR to place them back in the file room.  This
> exercise did not require me to be available because [Willie Maye, Jr., Director of
> Employment Services in Human Resources], whose purview included the File
> Room, and his team were working worked with Ognibene and his team.

(Maduegbuna Decl., Ex. 4 (Pltf. Decl.) (Dkt. No. 83-4) ¶¶ 18-19)  Moreover – as Judge Willis

points out (R&R (Dkt. No. 95) at 25-26) – the fact that Krauss took five days of leave in mid-

August 2018 suggests that Plaintiff's leave request did not present an undue hardship.

In sum, there is conflicting evidence concerning the hardship issue, and this issue cannot be resolved as a matter of law.

Accordingly, Defendants' motion for summary judgment concerning Plaintiff's failure to accommodate claim will be denied to the extent that that claim is premised on Plaintiff's herniated disk and back pain condition.

**C.**    **Plaintiff's Disability Discrimination Claims**

Judge Willis recommends that Defendant's motion for summary judgment on Plaintiff's disability discrimination claims under the Rehabilitation Act, the NYSHRL, and the NYCHRL be denied.  (Id. at 45)

**1.**    **Applicable Law**

To make out a prima facie claim of disability discrimination under the Rehabilitation Act, a plaintiff must show that "'(1) plaintiff's employer is subject to the [Rehabilitation Act]; (2) plaintiff was disabled within the meaning of the [Rehabilitation Act]; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability.'" Quadir v. New York State Dep't of Lab., 39 F. Supp. 3d 528, 540 (S.D.N.Y. 2014) (quoting Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004)).

Where a plaintiff establishes a prima facie case, "the burden . . . shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011) (internal quotation marks omitted).  If the employer carries that burden, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004).  "A plaintiff's

44

evidence at the third step of the <u>McDonnell Douglas</u> analysis must be viewed as a whole rather than in a piecemeal fashion." <u>Walsh v. New York City Hous. Auth.,</u> 828 F.3d 70, 76 (2d Cir. 2016) (citing <u>Byrnie v. Town of Cromwell, Bd. of Educ.,</u> 243 F.3d 93, 102 (2d Cir. 2001)). "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." <u>Id.</u> "[A] plaintiff alleging an employment discrimination claim under Section 504 of the Rehabilitation Act must show[, however,] that the plaintiff's disability was a but-for cause of the employer's action." <u>Natofsky v. City of New York</u>, 921 F.3d 337, 341 (2d Cir. 2017).

"Employment discrimination claims brought under the NYSHRL and the NYCHRL also are analyzed using the <u>McDonnell Douglas</u> analysis." <u>Concepcion v. City of New York</u>, No. 15 CIV. 2156 (AJP), 2016 WL 386099, at *7 n.8 (S.D.N.Y. Jan. 29, 2016). However, "a plaintiff asserting a [NY]CHRL claim must only show that 'her employer treated her less well, at least in part for a discriminatory reason.'" <u>Alleyne v. Scherveer Nursing Care Ctr.,</u> No. 13CV3072SLTCLP, 2017 WL 4358729, at *11 (E.D.N.Y. Sept. 29, 2017) (quoting <u>Mihalik</u>, 715 F.3d at 110 n.8). Nonetheless, "the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, or if the defendant proves the conduct was nothing more than petty slights or trivial inconveniences." <u>Mihalik</u>, 715 F.3d at 113 (citations and quotations marks omitted).

2.    **Analysis**

Defendants do not dispute the first and second elements of Plaintiff's <u>prima facie</u> case: (1) that ACS is subject to the relevant statutes; and (2) that Plaintiff's herniated disk qualifies as a disability under the Rehabilitation Act, the NYSHRL, and the NYCHRL, and that

her uterine fibroids qualify as a disability under the NYSHRL and the NYCHRL.  (R&R (Dkt. No. 95) at 27)

Moreover, Defendants either concede or do not dispute that Plaintiff was qualified to perform the essential functions of the various positions that she held or applied for between 2012 and 2019, including the position of (1) Executive Director and Chief of Staff, which Plaintiff held from 2012 to 2019; (2) Acting Assistant Commissioner of Human Resources, which Plaintiff held in 2015 and again 2018; (3) Associate Commissioner of Human Resources, which Plaintiff applied for in 2018; (4) Assistant Commissioner of Recruitment and Retention, which Plaintiff applied for in 2018; and (5) Executive Director of Special Projects, which Plaintiff held between January 2019 and April 2019.  (See id. at 27-29)  This Court finds no error in Judge Willis's determination that Plaintiff was qualified for these positions.

As to the final element of the prima facie case, Judge Willis finds that Defendants subjected Plaintiff to four adverse employment actions:  (1) in October 2018, they failed to promote her to the Associate Commissioner position; (2) in January 2019, they changed Plaintiff's title from Executive Director and Chief of Staff to Executive Director of Special Projects, and reduced the number of employees she supervised from twelve to two; (3) in April 2019, they terminated Plaintiff's position, informing her that "she did not have any work to do, and she had about 2 weeks to vacate her office"; and (4) between the summer of 2018 and April 2020, they did not select Plaintiff for the Assistant Commissioner of Recruitment and Retention position.  (R&R (Dkt. No. 95) at 30-32)  This Court finds no error in Judge Willis's determination that these actions constitute adverse actions for purposes of Plaintiff's prima facie case.

Finally, Judge Willis concludes that Plaintiff has offered evidence sufficient to satisfy the causation requirement for each of these four adverse actions. (Id. at 34-36) Plaintiff's disability discrimination claims involve the same alleged adverse actions as her retaliation claims, and all of the alleged adverse actions allegedly resulted from Plaintiff's requests for medical leave in 2018 and 2019. This Court therefore finds that Plaintiff has satisfied the causation requirement for her disability discrimination claims under the Rehabilitation Act, the NYSHRL, and the NYCHRL for the same reasons that Plaintiff has satisfied the closely related requirements for her retaliation claims under these same statutes.

Accordingly, Defendant's motion for summary judgment on Plaintiff' disability discrimination claims will be denied.

**D.      Plaintiff's Age Discrimination Claims**

Plaintiff alleges that Defendants engaged in age discrimination in violation of the NYSHRL and the NYCHRL when they (1) reassigned some of her duties to Evan Jones and Brandon Respress – who were both younger than Plaintiff – between January 2019 and April 2019; and (2) hired Respress for the Assistant Commissioner of Recruitment and Retention position in April 2020. (Am. Cmplt. (Dkt. No. 51) at ¶¶ 104-106; see also R&R (Dkt. No. 95) at 5, 36-38)

To establish a prima facie case of age discrimination under the NYSHRL and NYCHRL, a plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." Gorzynski, 596 F.3d at 107; see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (prima facie case determination for age discrimination claims brought under the NYSHRL and NYCHRL is subject to the same analysis as claims brought under the ADEA).

"The class protected . . . is limited to persons 40 years of age or older." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).

Where a plaintiff establishes a prima facie case, the burden shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." Brennan, 650 F.3d at 93. If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for age discrimination. A plaintiff meets this burden by identifying "inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." See Drummond v. IPC International, Inc., 400 F. Supp. 2d 521, 528 (E.D.N.Y. 2005). Finally, and for purposes of the NYSHRL, a plaintiff must proffer evidence sufficient to demonstrate that there is a triable issue of fact as to whether his or her age was the "but-for" cause of the adverse employment action. Gorzynski, 596 F.3d at 106.[6]

Under the NYCHRL, by contrast, "summary judgment is appropriate if 'the record establishes as a matter of law' that discrimination or retaliation 'play[ed] no role' in the defendant's actions." Ya-Chen, 805 F.3d at 76 (quoting Mihalik, 715 F.3d at 109).

Judge Willis concludes that Plaintiff has failed to make the requisite prima facie showing of discriminatory intent under either the NYSHRL or NYCHRL:

> Plaintiff has not shown that any conduct gives rise to a reasonable inference of age discrimination and offers no case law in support. Plaintiff also offers no comments made related to her age nor any instances where any Defendants treated her less well due to her age. Conversely, Defendants note that Defendants Hansell, Krauss, and Hester are all over the age of 40 so there is no reason to find age-based discrimination[,] citing the "same protected age group inference."

---

[6] Historically, "claim[s] of disability discrimination under the [NYSHRL] . . . [were] governed by the same legal standards as govern federal ADA claims." Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 n.3 (2d Cir. 2006). However, "an amendment to the NYSHRL, effective October 11, 2019, has put in place a more lenient standard of liability that has been likened to that of the NYCHRL." Yost v. Everyrealm, Inc., 657 F. Supp. 3d 563, 578 (S.D.N.Y. 2023). Because the conduct here took place between 2018 and June 3, 2019, the conduct falls under the pre-amendment version of the NYSHRL.

Memo at 32. "Under the 'same protected age group' inference, 'where the plaintiff and the individual whose conduct is at issue are members of the same protected class, the inference that the conduct constitutes harassment or discrimination is weakened.'" Jacobson v. Cap. One Fin. Corp., No. 16-CV-06169 (CM), 2018 WL 6817064, at *31 (S.D.N.Y. Dec. 12, 2018) (quoting Waters v. Gen. Bd. of Global Ministries, 769 F. Supp. 2d 545, 554 (S.D.N.Y. 2011)). Because the Defendants accused of engaging in age discrimination are all within the protected group and because Plaintiff offers no other information regarding discrimination, this Court does not believe that Plaintiff has met her prima facie burden.

Additionally, with respect to the hiring of Respress as Assistant Commissioner, Defendants allege that Respress was 40 years old by the time he was selected for the position. Memo at 33. Given this, he and Plaintiff were in the same protected class and Plaintiff offers no evidence that Defendants offered the position to a member outside of her protected class. Plaintiff fails to make out a prima facie case of discrimination with respect to the failure to promote her to Assistant Commissioner.

(R&R (Dkt. No. 95) at 37-38) This Court finds no error in Judge Willis's analysis.

Accordingly, Defendants' motion for summary judgment on Plaintiff's age discrimination claims will be granted.

**E.    Plaintiff's FMLA Interference Claim**

Plaintiff alleges that Defendants interfered with her FMLA rights by denying her August 2018 leave request. (Am. Cmplt. (Dkt. No. 51) ¶¶ 159-66)

To prevail on an FMLA interference claim, a plaintiff must establish "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." Graziadio, 817 F.3d at 424. In seeking summary judgment on this claim, Defendants contend that under Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002), they are not liable for FMLA interference, because "plaintiff has not lost any wages, salary, employment benefits, or other compensation; nor has she sustained any actual monetary

loss as a result of the alleged interference with her rights under the FMLA."  (Def. Br. (Dkt. No. 75) at 28-29)

Plaintiff's opposition brief does not address any of Defendant's arguments related to the FMLA interference claim.  And in their reply brief, Defendants ask that Plaintiff's FMLA interference claim be deemed abandoned.  (Def Reply (Dkt. No. 78) at 5)  Judge Willis agrees with Defendants:

> Where a counseled non-moving party submits "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others," the response "may be deemed an abandonment of the unmentioned claims."  Camarda v. Selover, 673 F. App'x 26, 30 (2d Cir. 2016) (quoting Jackson v. Federal Express, 766 F.3d 189, 195 (2d Cir. 2014)).  "[W]here abandonment by a counseled party is not explicit," the Court may infer abandonment "from the papers and circumstances viewed as a whole."  Id.

> Here, Plaintiff is represented by counsel and submitted a detailed opposition to Defendant's Motion for summary judgment.  See Opp.  The opposition does not mention the FMLA interference claims and only defends the claims for FMLA retaliation.  Id.  This Court considers this to be an abandonment of Plaintiff's FMLA interference claims.

(R&R (Dkt. No. 95) at 39)

This Court find no clear error in Judge Willis's determination that Plaintiff has abandoned her FMLA interference claim.  Accordingly, Defendants' motion for summary judgment on Plaintiff's FMLA interference claim will be granted.

## CONCLUSION

For the reasons stated above, Judge Willis's R&R is adopted in its entirety. Defendant's motion for summary judgment (Dkt. No. 74) is granted in part and denied in part as set forth above.  The Clerk of Court is directed to terminate the motion (Dkt. No. 74).

This matter will proceed to trial on **May 19, 2025**.  The joint pretrial order, motions in limine, requested voir dire, and requests to charge are due on **April 21, 2025**.

Responsive papers are due **May 5, 2025**.  The parties are directed to consult this Court's

Individual Rules as to the contents of these materials.

Dated:  New York, New York
        March 25, 2025

                                SO ORDERED.

                                _____
                                Paul G. Gardephe
                                United States District Judge